## STATE OF CONNECTICUT *v.* TEDDY A. DRAKEFORD
### (12673)

PETERS, C. J., HEALEY, SHEA, DANNEHY and S. FREEDMAN, Js.

Argued October 7, 1986—decision released January 20, 1987

*Barbara Goren,* special public defender, for the appellant (defendant).

*Donald A. Browne,* state's attorney, with whom, on the brief, was *Dominick J. Galluzo,* assistant state's attorney, for the appellee (state).

S. FREEDMAN, J. After a trial to a jury, the defendant, Teddy A. Drakeford, was found guilty of murder in violation of General Statutes § 53a-54a and received a sentence of thirty-five years. He appeals from that conviction. This appeal generates three issues: (1) whether the trial court erred in proceeding with jury selection in the absence of the defendant; (2) whether the trial court erred in failing to appoint new counsel; and (3) whether the trial court erred in excluding certain ballistics evidence. We find no error.

The jury could reasonably have found the following facts. The body of the victim was found on Hough Avenue in Bridgeport on October 2, 1983, at approximately 4 a.m. The legs of the clothed body were wrapped in a piece of bloodstained pink foam material. The body lay about three feet behind a dump truck used by the defendant and owned by his employer. The victim had left his apartment during the early evening of October 1, 1983, and was present that same evening at the Hough Avenue apartment of his friend, the defendant. An autopsy examination disclosed a shotgun wound to the back between the shoulder blades and extensive trauma to the face, including fractured upper and lower jaws, lacerations of the lip and fractured teeth. It also revealed that the body contained one hundred fifty-one shotgun pellets, pieces of shotgun wadding in the chest cavity and entrance wound, portions of a foam material containing eleven pellets, and a wooden substance in the mouth. The shotgun wound preceded the mouth injuries and was the cause of death.

The defendant shared a second floor apartment and an attic at Hough Avenue with Cynthia Jelks, Eugene Mack and Mae McArthur, and with his two children. The first floor was occupied by Benigno Torres Santiago, his wife Maria Ortiz, and a daughter, Rosemarie Avila.

Avila observed the victim arrive on his bicycle at the defendant's apartment about 6 p.m. About 11 p.m. she heard a loud noise which seemed to shake the house. About 11:30 p.m. she heard a noise on the second floor stairs. Looking outside, she saw the defendant carrying a roll of pink foam which he deposited into the truck that he used. On a previous occasion she had seen the defendant with the same kind of foam going up to fix the attic. The next morning Avila saw dark stains on the front porch in front of the second floor apartment door and also saw the victim's bicycle at the side of the house.

Ortiz observed the victim place his bicycle on the front porch at about 6 p.m. on October 1, 1983, and go upstairs. She later saw the victim and the defendant leave at approximately 8 p.m. and she did not see them return. Later that evening, however, she heard "a big noise" upstairs.

During the evening of October 1, 1983, Mack was awakened by "something like a big bump" from above. That evening, McArthur was awakened by a loud noise sometime after 11 p.m. Immediately after, she heard other noises that sounded like things being moved around in the attic.

On October 2, 1983, Bridgeport police, after canvassing the neighborhood, executed a search warrant for the second and third floors of the Hough Avenue apartment. In the third floor attic behind a sheetrock wall they found a twenty gauge shotgun with bloodstains and negroid hair. Seized from the rafters was a piece of bloodstained foam material which appeared to "match up" with the piece of foam found on the victim's body. The police also found two rugs on the floor. The bottom rug was blood soaked and contained negroid hairs and tooth particles. The top rug contained bloodstains and particles of negroid hair. In a backyard garbage can they found a bloodstained paper bag with negroid hairs on it and a shirt inside with bloodstains. The steps from the attic to the second floor and from the second floor to the first floor revealed drops of blood, as did the front porch.

The twenty gauge shotgun along with two shotgun shells had been given to the defendant by David D. Reed, for whom he worked. The pink foam material found on the body was consistent with the foam padding that Reed was installing in houses he was constructing, which the defendant had previously been hired to watch as a security person.

Odontological examination revealed that the tooth particles recovered from the rug in the attic matched the victim's broken upper right bicuspid, and tooth particles recovered from the shotgun stock matched the victim's broken upper left central incisor.

I

The defendant claims the trial court erred in proceeding with jury selection in his absence and in not delaying the trial. We cannot agree.

On October 10, 1984, after voir dire examination of a prospective juror, the defendant announced he was ready to go back to jail. Informed that the court was proceeding with the trial, the defendant told the court that he and his lawyer had had a disagreement over juror selection, a fact confirmed by his attorney.[1] Generally complaining about his treatment,[2] he repeatedly interrupted the trial court's attempts to explain his rights and the court procedures,[3] expressed displeasure with his attorney, requested a public defender, and refused to take part in jury selection. The court made it clear on several occasions that the case would continue, a directive with which the defendant took issue as he refused to quiet down and repeatedly interrupted the court. He was informed that he could leave if he wished and return if he agreed to follow the court rules. He was finally removed from the courtroom at his own request. The court then took a forty-two minute recess, after which a sheriff was sent to inform the defendant

[1] "Mr. LaFollette [Defense counsel]: Your Honor, the problem is that my client is—wants me to reject everybody and I have to pick somebody."

[2] The defendant also complained about questions asked by the assistant state's attorney during voir dire, expressed displeasure with the towns in which the jurors resided as well as with his counsel's desire to accept certain jurors, and complained of the length of time he had spent in jail pending trial, as well as of his general unhappiness with the court's treatment of him.

[3] The defendant interrupted the trial judge on ten different occasions while the judge was attempting to explain the defendant's situation to him.

that the court was prepared to continue the trial and that the defendant was entitled to return if he agreed to conduct himself properly. The sheriff reported that the defendant declined to return to the courtroom. One juror was chosen that day after the defendant absented himself.

The following day, October 11, 1984, the defendant again refused to take part in jury selection, generally continuing his outbursts of the day before. By the end of the day, seven jurors had been selected. On October 12, 1984, the defendant returned to the courtroom for the remainder of the trial.

That the defendant has a constitutional right to be present at all stages of his criminal trial is not disputed. It is also clear that he may waive this right by his conduct, misconduct or his voluntary and deliberate absence from the trial without good cause. *Illinois* v. *Allen,* 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970); *Talton* v. *Warden,* 171 Conn. 378, 384, 370 A.2d 965 (1976); 21 A.L.R. Fed., Continuing Trial— Absent Defendant, 906. The facts of this case do not rise to the level of those in *Illinois* v. *Allen,* supra, 343, where the eviction of disruptive defendants from the courtroom was approved, although it is clear that they approached triggering that response.[4]

We have long held that the right to be present at a criminal trial may be lost by consent, waiver or misconduct. See, e.g., *Talton* v. *Warden,* supra. Waiver need not be express. It may be implied from the totality of acts or conduct of a defendant. Id.; see also *State* v. *Parham,* 174 Conn. 500, 505, 391 A.2d 148 (1978).

---

[4] On October 10, 1984, the court indicated that, "in the event [the defendant] had not voluntarily removed himself from the courtroom it would have been necessary for the court to remove him pursuant to [Practice Book] Section 892 in that it was obviously impossible for us to continue in anything approaching an orderly manner."

The evidence clearly indicates that when the defendant announced his desire to return to his cell at the North Avenue jail, he unequivocally waived his right to attend jury selection, and the court properly allowed him to leave.

The defendant, however, urges us to require our trial courts to adopt, in these circumstances, the balancing test regarding suspension of trial enunciated in *United States* v. *Tortora,* 464 F.2d 1202, 1210 (2d Cir. 1972), cert. denied sub nom. *Santoro* v. *United States,* 409 U.S. 1063, 93 S. Ct. 571, 34 L. Ed. 2d 516 (1972). Essentially, that test required the trial court to weigh the likelihood that trial could soon take place with the defendant present, the administrative problems of scheduling, and the burden on the government and its witnesses. Id. We decline that invitation. The *Tortora* court did not set forth a general rule. It addressed only the exercise of the trial judge's discretion in the extraordinary event that a defendant, after release on bail, fails to appear for trial. In this case, the defendant was not only in custody, but present in court when he voluntarily opted to leave the proceedings. Moreover, recognizing that deliberate absence without sound reason "indicates nothing less than an intention to obstruct the orderly processes of justice," the Court of Appeals in *Tortura* held that "[n]o defendant has a unilateral right to set the time or circumstances under which he will be tried." Id., 1208.

Significantly, the defendant had counsel of his own choosing available to him for legal advice. *State* v. *Carpenter,* 541 S.W.2d 340, 343 (Mo. App. 1976). Beyond this, the trial judge attempted to explain the situation to him during a prolonged colloquy in which the defendant repeatedly interrupted and impeded the judge's efforts to advise him. Neverthless, the court made clear that the trial was continuing, that the defendant was welcome to stay if he obeyed the court

rules, and that he had the right to leave if he so desired. He chose to leave. More, the court took a lengthy recess, at the end of which it sent a sheriff to inquire of the defendant whether he was willing to return to the courtroom. He refused. It is difficult to fault the actions of the trial court.

Permitting a defendant unilaterally to prevent his case from going forward would give him the license to defy the law with impunity, and in the process, to paralyze the proceedings of courts and juries. *People* v. *Sanchez,* 65 N.Y.2d 436, 443–44, 492 N.Y.S.2d 577, 482 N.E.2d 56 (1985). "We cannot permit an accused to elect to pursue one course at the trial and then . . . to insist on appeal that the course which he rejected at the trial be reopened to him . . . . [T]he protection which could have been obtained was plainly waived . . . . The court only followed the course which he himself helped to chart . . . ." *Johnson* v. *United States,* 318 U.S. 189, 201, 63 S. Ct. 549, 87 L. Ed. 704 (1943).

If a defendant deliberately leaves the courtroom after his trial has begun, he forfeits his right to be present at trial. *People* v. *Sanchez,* supra. Having forfeited that right, he cannot be allowed to claim any advantage because of his absence. *People* v. *Owens,* 102 Ill. 2d 145, 157, 464 N.E.2d 252 (1984).

While we have not required the procedure of bringing the defendant personally before the court, advising him of his right to be present, and then permitting a knowing and intelligent waiver; *Talton* v. *Warden,* supra, 384; we do believe that a defendant should be warned of the consequences of his failure to attend trial. We conclude, however, that it is sufficient if the trial court indicates to the defendant that the trial will continue in his absence. Under the circumstances of this case, the court did not abuse its discretion in permitting the voir dire examination to continue.

## II

The defendant next argues that the trial court erred by failing to inquire into the defendant's request for new counsel, and by failing to appoint new counsel.

The defendant had retained an attorney, Ernest LaFollette, as private counsel at his employer's suggestion. LaFollette was subsequently granted special public defender status. His appearance for the defendant was filed October 18, 1983, approximately one year prior to trial. He represented the defendant at a hearing on probable cause and subsequently filed motions for disclosure, supplemental disclosure, bond reduction, compliance, taking of a deposition, erasure, suppression and sequestration. It was not until October 10, 1984, almost one year later, when jury selection had begun, that the defendant first expressed dissatisfaction with his attorney.

We must distinguish between a substantial and timely request for new counsel pursued in good faith, and one made for insufficient cause on the eve or in the middle of trial. *McKee* v. *Harris,* 649 F.2d 927, 931 (2d Cir. 1981), cert. denied, 456 U.S. 917, 102 S. Ct. 1773, 72 L. Ed. 2d 177 (1982); *United States* v. *Calabro,* 467 F.2d 973, 986 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S. Ct. 1357, 35 L. Ed. 2d 587, reh. denied, 411 U.S. 941, 93 S. Ct. 1891, 36 L. Ed. 2d 404 (1973); *State* v. *Watson,* 198 Conn. 598, 610, 504 A.2d 497 (1986).

Initially, we note that a trial judge's failure to inquire into the defendant's request for new counsel where the defendant has already made known the reasons for his request is not error. *McKee* v. *Harris,* supra, 933; *Brown* v. *United States,* 264 F.2d 363, 369 (D.C. Cir. 1959) (Burger, J., concurring in part). There is no doubt that the defendant utilized fully his opportunity to air his representational grievances to the court.

There is no "unlimited opportunity to obtain alternate counsel." *State* v. *Watson,* supra. It is within the trial court's discretion to determine whether a factual basis exists for appointing new counsel. Id. Moreover, absent a factual record revealing an abuse of that discretion, the court's failure to allow new counsel is not reversible error. Id.; *El Idrissi* v. *El Idrissi,* 173 Conn. 295, 302–303, 377 A.2d 330 (1977).

The defendant chose his own lawyer. The court granted him special public defender status. Indeed, he represented the defendant for approximately one year. He took part in a hearing on probable cause and filed a considerable number of pretrial motions. The record discloses no evidence of difficulty between counsel and client until the trial started. While jurors were being selected, the defendant claimed a difference of opinion with his lawyer over that selection.

Differences of opinion over trial strategy are not unknown, and do not necessarily compel the appointment of new counsel. *Commonwealth* v. *Chew,* 338 Pa. Super. 472, 479, 487 A.2d 1379 (1985). A request for substitution of counsel requires support by a substantial reason, and may not be used to achieve delay. *State* v. *Beaulieu,* 164 Conn. 620, 628–29, 325 A.2d 263 (1973). In *United States* v. *Calabro,* supra, 985–86, the court cited with approval the American Bar Association Project On Standards For Criminal Justice: "[A] defendant is entitled to make the ultimate decision only in regard to whether to plead guilty, whether to waive a jury, and whether to testify; 'all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client.' " Standards Relating to the Prosecution Function and the Defense Function, The Defense Function § 5.2 (1971).

A defendant has no "unbridled right to discharge counsel *on the eve of trial. . . .* In order to work a delay

by a last minute discharge of counsel there must exist exceptional circumstances." (Emphasis in original.) *United States* v. *Grow*, 394 F.2d 182, 209 (4th Cir.), cert. denied, 393 U.S. 840, 89 S. Ct. 118, 21 L. Ed. 2d 111 (1968). The defendant gave no substantial reason for requiring new counsel. If anything, his own unreasonable conduct caused the conflict with counsel. In view of the history of their relationship, the prior activity of the defendant's attorney on his behalf and the timing of the request, the court did not abuse its discretion in the manner in which it discharged its duty to the defendant regarding his right to representation. The court could have made further inquiry into the matter. Under the totality of the circumstances, however, the court acted well within its discretion. Because any problem was of the defendant's own making, we conclude that the defendant is "in no position to complain of a situation for which he was intentionally and knowingly responsible." Id., 210.

### III

Finally, the defendant claims the trial court erred in excluding certain ballistics evidence offered by the defendant as part of his case.

Trooper Marshall Robinson, the state's ballistics expert, testified that the one hundred fifty-one pieces of lead shot removed from the victim's body were number 7½ shot. He also examined shotgun wadding recovered from the victim's chest, finding it consistent in size with the wadding used in twenty gauge cartridges. He testified that the wadding had been soaked in blood causing it to swell and expand.

Subsequently, the defendant placed Tina Marie Rosa on the stand and made an offer of proof that in mid-September, 1983, she had seen a gun, which she had difficulty describing, on the first floor premises of

Benigno Torres Santiago. She admitted that the gun she saw was smaller than the gun the state alleged to be the murder weapon. The court refused to allow the evidence on the basis of lack of materiality.

The evidence relative to the weapon used by the defendant was overwhelming. After review of the record, this court cannot say that the admission of evidence that a smaller gun was seen in the first floor apartment two weeks before the shooting could have reasonably affected the jury verdict. The trial court did not abuse its discretion in its ruling.

Later, the defendant offered to produce evidence from Frank Generini, whom he sought to qualify as an expert, that the buckshot was 7½ shot and that the wadding in question was too large for a twenty gauge shell, but that a sixteen gauge shell would be closer to what was found. The court rejected the proffered testimony on the ground of immateriality.

The size of the shot had already been demonstrated by the state's expert. Repetition of this testimony by the defendant's witness was, at best, cumulative; *State v. Randolph,* 190 Conn. 576, 589–90, 462 A.2d 1011 (1983); and of no particular relevance. The trial court did not abuse its discretion in refusing to admit it.

The offer regarding the size of the shotgun wadding came from a witness whose expertise was not established to the court's satisfaction. Even though it may have been error to reject the evidence, its exclusion was clearly harmless in view of the strength of the prior testimony regarding the weapon in question and its identification as the murder weapon, as well as all the other evidence in the case.

There is no error.

In this opinion the other justices concurred.