## STATE OF CONNECTICUT *v.* RUBEN GONZALEZ
## (12884)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and HULL, Js.

Argued November 3—decision released December 29, 1987

*Francis T. Mandanici,* special public defender, for the appellant (defendant).

*Michael E. O'Hare,* assistant state's attorney, with whom, on the brief, was *Kevin P. McMahon,* assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue on this appeal is whether the trial court adequately explored the defendant's competency to stand trial after it was informed, in the middle of trial, that the defendant had attempted suicide and had been prescribed the antipsychotic drug Haldol. A jury of six found the defendant, Ruben Gonzalez, guilty of one count of attempted robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2),[1] three counts of kidnapping in the first degree with a firearm in violation of General Statutes §§ 53a-92a and 53a-92 (a) (2) (B),[2]

---

[1] General Statutes § 53a-49 (a) (2) provides: "CRIMINAL ATTEMPT. SUFFI-CIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-134 (a) (2) provides: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon."

[2] "[General Statutes] Sec. 53a-92a. KIDNAPPING IN THE FIRST DEGREE WITH A FIREARM; CLASS A FELONY; ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of kidnapping in the first degree with a firearm when he commits kidnapping in the first degree as provided in section 53a-92, and in the commission of said crime he uses or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, machine gun, shotgun, rifle or other firearm. No person shall be convicted of kidnapping in the first degree and kidnapping

and three counts of attempted assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1).[3] The defendant appeals from the ensuing judgment sentencing him to thirty years of imprisonment. We find no error.

The jury could reasonably have found the following facts: At 7:15 in the morning of March 3, 1984, Paul Serrantino, an employee of the First National Supermarket in Hartford, opened the back door of the store to allow a vendor to enter. Close on the vendor's heels was a man, subsequently identified as the defendant, wearing a ski mask and brandishing a revolver. The defendant informed Serrantino that "[t]his is a robbery" and ordered Serrantino to shut and lock the door and to call the manager to the backroom. Upon the arrival of the assistant manager, Wendell Labbe, and the manager, Joseph Scully, the defendant ordered them to open the safe, which was located in the office at the front of the store. In the meantime, the defendant forced all the other employees to gather in the backroom and then had them walk toward the front of the store and kneel in the aisle. While Scully opened the safe, the defendant intermittently pointed his gun at the employees and at the occupants of the office. When the safe was open, the defendant, while holding the revolver to Scully's head, examined its contents and discovered a locked drop-box in which most of the store's

in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

General Statutes § 53a-92 (a) (2) (B) provides: "KIDNAPPING IN THE FIRST DEGREE. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony."

[3] General Statutes § 53a-59 (a) (1) provides: "ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

money had been deposited. After being informed that the only key to the box was in the possession of an armored car service, the defendant, noticing the screws in the hinge of the box, requested a screwdriver and ordered Scully to use it to open the box. When Scully's attempts failed, the defendant grabbed the screwdriver from him and, leaning into the safe, attempted to pry open the box with it. At this moment, Labbe pressed the silent alarm button and, with a club that had been hanging on the wall of the office, struck the defendant on the side of the head. The defendant began to fall but then rose up and pointed his gun directly at Labbe. A scuffle between the three men ensued during which the defendant pointed his revolver at Scully's face and screamed that he was going to kill Scully. Although the defendant squeezed the trigger of the gun several times, the gun did not fire because Labbe's thumb interfered with the functioning of the hammer. Hearing the noise from the struggle, the other employees came to the assistance of Scully and Labbe. They struck the defendant until they succeeded in wresting the revolver from his hand. The police subsequently arrived, arrested the defendant, and took him to a hospital for treatment of the injuries he had suffered as a result of the struggle. On the basis of this evidence, the jury convicted the defendant of all of the crimes with which he had been charged.

On appeal the defendant raises four claims of error. He argues that the trial court erred in: (1) failing to allow the defendant to discharge his attorney; (2) adjudging the defendant competent; (3) expelling the defendant from the courtroom; and (4) charging the jury on circumstantial evidence. We find no error.

I

In order to consider the defendant's first three claims, it is necessary, at the outset, to review the events that took place at trial.

The defendant was arraigned on March 27, 1984. On September 6, 1984, the trial court, pursuant to General Statutes § 54-56d (c),[4] ordered the court's Diagnostic Clinic to examine the defendant to determine his competency to stand trial. At the competency hearing held a few days thereafter, Dr. John F. Fitzgerald, chief psychiatric social worker of the hospital section of the Hartford Correctional Center, testified that the defendant had been examined by a three member team, who had concluded unanimously that the defendant was not competent to stand trial. According to Dr. Fitzgerald, the diagnostic team had considered the possibility that the defendant was malingering, but had concluded that he was suffering from a depressive disorder that resulted in his inability to understand the legal proceedings against him and to cooperate with counsel in his own defense. The report filed by the diagnostic team emphasized the defendant's confusion and disorientation and noted that the defendant was on "major psychotropic medication indicating that other persons who have an opportunity to see him and spend considerably more time with him view him as suffering from a mental condition." Dr. Fitzgerald further testified that there was a "substantial probability" that the defendant could be restored to competency in the structured setting of a state hospital. On the basis of this testimony and the report, the court found the defendant incompetent to stand trial and, pursuant to

---

[4] "[General Statutes] Sec. 54-56d. (Formerly Sec. 54-40). COMPETENCY TO STAND TRIAL. (a) Competency required. Definition. A defendant shall not be tried, convicted or sentenced while he is not competent. For the purposes of this section, a defendant is not competent if he is unable to understand the proceedings against him or to assist in his own defense. . . .

"(c) Request for examination. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency."

General Statutes § 54-56d (h) and (i),[5] committed him temporarily to Norwich State Hospital.

Four months later, the trial court held a second competency hearing. At that hearing, Dr. Hans Langhammer, a psychiatrist on the staff of Norwich State Hospital, testified that he had examined the defendant on three separate occasions, consulted the defendant's hospital records, discussed his case with the diagnostic team, and concluded that the defendant was not mentally ill and was competent to stand trial. According to Dr. Langhammer, the defendant seemed to have "all the possible psychotic diagnoses which exist" and consequently had none of them. The defendant did not receive

---

[5] General Statutes § 54-56d (h) and (i) provides: "COMPETENCY TO STAND TRIAL. . . .

"(h) Court procedure if finding that defendant will regain competency. If, at the hearing, the court finds that there is a substantial probability that the defendant, if provided with a course of treatment, will regain competency within the period of any placement order under this section, the court shall order placement of the defendant for treatment for the purpose of rendering him competent.

"(i) Placement for treatment. Conditions. The placement for treatment for the purpose of rendering the defendant competent shall comply with the following conditions: (1) The period of placement under the order or combination of orders shall not exceed the period of the maximum sentence which the defendant could receive on conviction of the charges against him or eighteen months, whichever is less; (2) the placement shall be either in the custody of the commissioner of mental health, the commissioner of children and youth services or the commissioner of mental retardation or, if the defendant or the appropriate commissioner agrees to provide payment, in the custody of any appropriate mental health facility or treatment program which agrees to provide treatment to the defendant and to adhere to the requirements of this section and (3) the court shall order the placement, on either an inpatient or an outpatient basis, which it finds is the least restrictive placement appropriate and available to restore competency. If outpatient treatment is the least restrictive placement for a defendant who has not yet been released from a correctional facility, the court shall consider whether the availability of that treatment is a sufficient basis on which to release the defendant on a promise to appear, conditions of release, cash bail or bond. If the court determines that the defendant may not be so released, the court shall order treatment of the defendant on an inpatient basis at a mental health facility or mental retardation facility."

antipsychotic medication while at Norwich State Hospital. In a letter that Dr. Langhammer had earlier submitted to the trial court, he stated that the results of the psychological evaluation that he had performed on the defendant could not rule out either malingering or psychosis. With regard to the inconclusive test results, the letter noted that "[w]hile [the defendant] did not exhibit acutely psychotic thinking or behavior, the presenting complaint of 'confusion' is not yet clarified. Whether it is a manifestation of his drug abuse or some other factor, is not known at this time." On the basis of this evidence, the trial court found the defendant competent to stand trial. The defendant did not object to this ruling.

From the beginning of the trial, the defendant persisted in engaging in bizarre and disruptive behavior. Before the first jury panel was brought into court, the defendant stood up and announced that his attorney was responsible for his being in jail, that he did not understand why he was there, that he did not want his attorney and that no one could do anything to him because he was God. The court, after warning him that if he did not sit down the trial would proceed without him, ordered the jury panel to be brought in. As the jury panel was exiting the courtroom after opening statements by counsel, the defendant exclaimed that he was innocent and that this attorney had gotten him locked up. When the court suggested that he confer with counsel before making other statements before the jury, the defendant responded, "why should I discuss anything with him when he got me in this place? I don't belong here, and I want to go home today." As the court attempted to explain to the defendant that if his disruptive conduct continued, the court would have to take measures to control him, the defendant repeatedly protested his innocence, demanded that he be left alone and insisted on his right to speak out.

The defendant's most extended outburst occurred the next day. Before having the jury panel brought in, the court again cautioned the defendant regarding his conduct. The defendant responded, "What are you going to do, kill me? . . . Are you going to kill me? Shoot me right here. Shoot me right here." When the court attempted to explain to the defendant that he would either be bound and gagged, held in contempt, or removed from the courtroom if he persisted, the defendant became more and more angry, insisting that he did not want to see his lawyer or anyone else, asking whether the court was going to kill him, and exclaiming that he was God. Eventually the defendant became so out of control that he threw his coat at the judge. The coat was intercepted by the clerk. After a recess, the court gave defense counsel an opportunity to confer with the defendant and had the defendant brought back into the courtroom. When the court attempted to resume the proceedings, the defendant continued to engage in disruptive behavior including repeatedly threatening to throw his shoes at the court. The court finally ordered the defendant handcuffed and had him removed from the courtroom.

In deciding what measures to take in response to the defendant's conduct, the court considered holding the defendant in contempt, having him bound and gagged, or excluding him from the courtroom. The court rejected contempt proceedings as inappropriate under the circumstances and concluded that binding and gagging the defendant would be prejudicial to his interests. Acknowledging the absence of out-of-court facilities that would allow the defendant to listen to or observe the proceedings, the court, nevertheless, determined that excluding the defendant from the courtroom would best ensure a fair and impartial trial. The court sought to protect the defendant's interests by ensuring ample opportunity for conferences with defense counsel and

by instructions to the jury not to draw any inferences from his absence. Defense counsel did not object to the trial court's ruling.

During the course of the trial, the defendant was brought into the courtroom and then removed at least another eleven times, usually in order to allow a witness called by the state to identify him. On each occasion, the defendant disrupted the proceedings by threatening his attorney, the sheriffs, and others in the courtroom, asking that the court kill him, exclaiming that he was God or, most frequently, repeating incessantly that he wanted to die. In addition, the defendant struggled with the sheriffs to such an extent that he had to be put in leg irons. At one point when the court asked the defendant whether he would be able to cooperate, he explained that he was hearing voices that were telling him that the people in court wanted to kill him and that he could not help himself. In another instance the court attempted to have the defendant held in an anteroom next to the courtroom so that he could hear the proceedings; the defendant's screaming and shouting, however, could be heard in the courtroom. Prior to having the defendant removed from the courtroom, the court regularly reminded the defendant that he would be able to return once he promised to behave. On several occasions, the court, in addition, directed defense counsel to consult with the defendant and keep him apprised of the progress of the trial.

In the middle of the trial, the court was made aware that the defendant had made a suicide attempt and had broken one of the chains binding him. As the result of a conversation with Dr. Serafini of the Hartford Correctional Center, the court was informed that the previous evening the defendant had been prescribed 20 milligrams of Haldol. Because of the uncertainty with regard to the defendant's mental condition, the court

decided to have the defendant examined anew to determine his competency to stand trial pursuant to General Statutes § 54-56d (c).

At this competency hearing, the only witness was Dr. Langhammer, who testified that he had examined the defendant again and had concluded that the defendant was able to understand the proceedings and cooperate with counsel. According to Dr. Langhammer, the extreme confusion manifested by the defendant, as well as his violent outbursts, were typical of malingering. In his testimony, Dr. Langhammer did not indicate that he knew that Haldol or other medication had been prescribed for the defendant nor did he state that he had consulted with the physician or physicians who had been treating the defendant. Defense counsel neither cross-examined Dr. Langhammer nor sought an opportunity to present any further evidence relevant to the defendant's competency. On this record, the court found that the defendant was still competent to stand trial. The defendant did not object to this finding.

## II

The defendant's first claim is that the trial court erred in not permitting the defendant to discharge his attorney. In support of this claim, the defendant points to the numerous instances during the course of the trial when he indicated displeasure with his attorney and attributed to him responsibility for the defendant's predicament.[6] Because of the defendant's expressed dissatisfaction with his attorney and the breakdown of communication between them, the trial court, according to the defendant, was required to allow the defendant to discharge his attorney. At a minimum, the defend-

---

[6] At various times, the defendant stated, "I don't want this guy anymore," "I don't want to see that guy anymore," "I don't want that lawyer either," "This guy got me locked up," and, on one occasion, he threatened to grab his attorney by the neck.

ant contends, the trial court erred by not inquiring into the basis of the defendant's complaints. We are not persuaded.

While a criminal defendant's right to be represented by counsel " 'implies a degree of freedom to be represented by counsel of defendant's choice. . .' "; *State* v. *Reed,* 174 Conn. 287, 292, 386 A.2d 243 (1978); this guarantee does not grant a defendant an " 'unlimited opportunity to obtain alternate counsel' " on the eve of trial. *State* v. *Drakeford,* 202 Conn. 75, 83, 519 A.2d 1194 (1987). "A request for substitution of counsel requires support by a substantial reason, and may not be used to achieve delay." Id.; see *State* v. *Gethers,* 193 Conn. 526, 543, 480 A.2d 435 (1984). Whether the circumstances warrant the appointment of new counsel is within the discretion of the trial court. *State* v. *Drakeford,* supra; *State* v. *Watson,* 198 Conn. 598, 610, 504 A.2d 497 (1986).

Applying this standard to the record before us, we conclude that the trial court did not abuse its discretion in not permitting the defendant to discharge his attorney. The record does not disclose that the defendant made a sustained effort to discharge his attorney. Rather, his outbursts directed toward counsel were merely instances of his generally disruptive conduct throughout the proceedings. Even if the defendant's repeated complaints regarding counsel are considered an attempt to discharge counsel, the defendant never offered a substantial reason for the appointment of new counsel. The defendant's claim that his attorney was responsible for his incarceration certainly does not qualify as such a reason.

The defendant argues that his counsel's alleged failure to represent the defendant zealously required the trial court to allow him to discharge his attorney. According to the defendant, trial counsel's failure to

file any pretrial or midtrial motions, to cross-examine Dr. Langhammer, to file any requests to charge, or to object to the charge constituted nonfeasance warranting his discharge by the defendant. Since this argument is, in essence, a disguised allegation of ineffective assistance of counsel, it is governed by our decisions requiring such claims to be pursued on a petition for a new trial or on a petition for a writ of habeas corpus, rather than on direct appeal, so that a complete factual record can be developed.[7] *State* v. *Tirado,* 194 Conn. 89, 92–93, 478 A.2d 606 (1984); *State* v. *Mason,* 186 Conn. 574, 578–79, 442 A.2d 1335 (1982).

Finally, the defendant argues that the complete breakdown in communication between himself and trial counsel warranted the appointment of new counsel. While we have recognized that in some circumstances a complete breakdown in communication may require a new appointment; *State* v. *Gethers,* supra, 543; we agree with the state that this case does not present circumstances of this sort. "A defendant is not 'entitled to demand a reassignment of counsel simply on the basis of a "breakdown in communication" which he himself induced.' *McKee* v. *Harris,* [649 F.2d 927, 932 (2d Cir. 1981), cert. denied, 456 U.S. 917, 102 S. Ct. 1773, 72 L. Ed. 2d 177 (1982)]." *State* v. *Gethers,* supra, 545. The record before us indicates that the defendant was entirely responsible for whatever breakdown in communication occurred between himself and his attorney. Cf. *State* v. *Drakeford,* supra, 84. We therefore conclude that the trial court did not abuse its discretion in not permitting the defendant to discharge his lawyer.

The defendant contends that even if the trial court was not required to appoint new counsel, it was at the

[7] Indeed, the defendant's brief indicates that he has filed a petition for writ of habeas corpus in the Superior Court.

very least required to inquire into the defendant's request. We are unpersuaded. "Where a defendant voices a 'seemingly substantial complaint about counsel,' the court should inquire into the reasons for dissatisfaction." *McKee* v. *Harris,* supra, 933, quoting *United States* v. *Calabro,* 467 F.2d 973, 986 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S. Ct. 1358, 35 L. Ed. 2d 587, reh. denied, 411 U.S. 941, 93 S. Ct. 1891, 36 L. Ed. 2d 404 (1973).[8] The defendant's eruptions at trial, however, fell short of a "seemingly substantial complaint." We conclude that, on the record before us, the trial court did not err in failing to inquire into the reasons underlying the defendant's dissatisfaction with his attorney.

### III

Before turning to the merits of the defendant's claims involving his competency, his expulsion from the courtroom, and the jury instructions on circumstantial evidence, we must address the state's argument that we should not reach them because the defendant failed to raise the claims at trial. While we ordinarily need not review claims raised for the first time on appeal, we have long recognized an exception for claims that implicate fundamental constitutional rights and a fair trial and are adequately supported by the record. *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973); see also *State* v. *Barrett,* 205 Conn. 437, 444, 534 A.2d 219 (1987). The defendant's claims fall within this exception as they facially implicate rights guaranteed by article first, § 8, of the Connecticut constitution and by the

---

[8] In his reply brief, the defendant cites *McMahon* v. *Fulcomer,* 821 F.2d 934, 942 (3d Cir. 1987), for the proposition that, even if the defendant did not provide a reason for his dissatisfaction, the trial court was required to inquire. In that case, however, unlike the case before us, the trial court had allowed the defendant to discharge his attorney but had not permitted him to seek new counsel. As a result, the defendant was forced to represent himself pro se and claimed a denial of right to counsel on that ground.

sixth and fourteenth amendments to the United States constitution. We therefore review the claims to determine whether the defendant's constitutional rights have been violated. See, e.g., *State* v. *McDonough*, 205 Conn. 352, 354, 533 A.2d 857 (1987); *State* v. *Simino*, 200 Conn. 113, 124–25, 509 A.2d 1039 (1986).

## IV

The defendant's next two claims arise from the disclosure, at midtrial, that the defendant had been administered 20 milligrams of Haldol the previous night. First, the defendant argues that the trial court erred in finding him competent without expressly ascertaining the nature and effects of Haldol at the competency hearing that the court ordered subsequent to the disclosure. Second, the defendant contends that the trial court violated his right to be present at trial by continuing to expel him without inquiring into the reason that Haldol had been prescribed and the effects that it might have had on his conduct. We disagree with both contentions.

## A

The conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. Conn. Const., art. I, § 8; U.S. Const., amend. XIV, § 1; see *Pate* v. *Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). This rule "imposes a constitutional obligation, [on the trial court], to undertake an independent judicial inquiry, in appropriate circumstances, into a defendant's competency to stand trial . . . ." *State* v. *Watson*, supra, 605; see *Drope* v. *Missouri*, 420 U.S. 162, 180, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *State* v. *DeAngelis*, 200 Conn. 224, 242, 511 A.2d 310 (1986). "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change

that would render the accused unable to meet the standards of competence to stand trial." *Drope* v. *Missouri,* supra, 181. This constitutional mandate is codified in General Statutes § 54-56d (a), which provides that "[a] defendant shall not be tried, convicted or sentenced while he is not competent." The record before us demonstrates that the trial court fulfilled this requirement when it ordered a new competency examination pursuant to § 54-56d (c), after the court was informed that the defendant had been given Haldol and had attempted suicide.

The defendant, nevertheless, would have had the trial court do more. He notes that Haldol is an antipsychotic drug used to treat schizophrenic and manic-depressive disorders and that it carries the risk of significant side effects, including exacerbating the symptoms for which it is given.[9] These characteristics of the drug, according to the defendant, imposed an obligation on the trial court to call Dr. Serafini of the Hartford Correctional Center to testify why Haldol had been administered to the defendant and to explain its potential side effects. Although calling Dr. Serafini might have been the more prudent course, we decline to impose so specific an obligation on the trial court.

"Competence to stand trial is a legal question which must ultimately be determined by the trial court." *State* v. *DeAngelis,* supra, 229. At the midtrial competency hearing, Dr. Langhammer gave expert testimony based both on his examination of the defendant that day and on his previous interaction with the defendant. In Dr. Langhammer's opinion, the defendant was competent to stand trial: he was malingering and was able to

---

[9] The Physician's Desk Reference (1986) (P.D.R.) states that Haldol "is indicated for the management of manifestations of psychotic disorders." Id., p. 1089. Among the drug's potential side effects, the P.D.R. lists anxiety, agitation, confusion and exacerbation of psychotic symptoms. Id., p. 1090.

understand the proceedings and to cooperate with counsel in his own defense. General Statutes § 54-56d (a). Defense counsel did not cross-examine Dr. Langhammer regarding the Haldol, and did not call witnesses to rebut Dr. Langhammer's conclusions; nor did he object to the trial court's finding of competence. The trial court was entitled to credit and rely on the testimony adduced at the hearing. "[T]he fact that the defendant was receiving medication . . . [of itself] does not render him incompetent." *State* v. *DeAngelis,* supra, 230. The trial court did not err in holding the defendant competent to stand trial subsequent to the midtrial hearing.

## B

We turn next to the defendant's claim involving his right to be present at trial. Under the confrontation and due process clauses of both the state and federal constitutions a criminal defendant has a right to be present at all critical stages of his trial. See *State* v. *Jarzbek,* 204 Conn. 683, 691–92, 529 A.2d 1245 (1987); *State* v. *Drakeford,* supra, 79. A defendant may forfeit this right by his "conduct, misconduct or his voluntary and deliberate absence from the trial without good cause." *State* v. *Drakeford,* supra; see *Illinois* v. *Allen,* 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353, reh. denied, 398 U.S. 915, 90 S. Ct. 1684, 26 L. Ed. 2d 80 (1970); Practice Book § 968. When faced with an obstreperous defendant a trial court may choose among three constitutionally permissible approaches: holding the defendant in contempt, binding and gagging the defendant, or banishing him from the courtroom. *Illinois* v. *Allen,* supra, 343–44; see also Practice Book § 892.

The defendant does not challenge the method chosen by the trial court to deal with the defendant's disruptive behavior; he argues, rather, that the record does not disclose that he had competently and know-

ingly waived his right to be present. See *State* v. *Simino,* supra, 129. Specifically, he contends that the fact that he had been administered Haldol suggests that his disruptive conduct was either a result of mental illness or a side effect of the Haldol and not, in either case, knowing and competent. According to the defendant, when the trial court discovered that he had been given Haldol, it should have inquired regarding the purpose and effects of the drug at the subsequent competency hearing to determine that the defendant's waiver of his right to be present was valid.

In *State* v. *Drakeford* supra, 81, we recently held that a trial court need not engage in a colloquy with a defendant expressly focused on the defendant's understanding of his right to be present to determine that a waiver of the right of presence was valid. Rather, the court may infer the defendant's waiver from the totality of his acts and conduct, so long as the defendant has been adequately informed that the trial would continue in his absence. Id., 79, 81; see also *Talton* v. *Warden,* 171 Conn. 378, 384, 370 A.2d 965 (1976). *Drakeford's* logic extends to the circumstances presented by the case at hand. Once the trial court determined at midtrial that the defendant was competent to stand trial, it did not have a further obligation to inquire whether the defendant's forfeiture of his right to be present was the result of incompetence induced by a mental disorder or by his taking Haldol. Cf. *Drope* v. *Missouri,* supra, 182.

A review of the record discloses that throughout the trial, the court repeatedly indicated to the defendant that the trial would continue in his absence and that, if the defendant assured the court that he would conduct himself properly, he would be permitted to return to the courtroom. See Practice Book § 893. At no time did defense counsel object to the defendant's removal

from the courtroom. We conclude that the trial court did not err in excluding the defendant from the courtroom because of his disruptive behavior.

## V

In his final claim of error the defendant challenges the propriety of the instructions delivered by the trial court regarding the inferences the jury could draw from circumstantial evidence. With regard to such evidence the court stated in its jury charge that "an inference may be made provided two elements of the application of this rule are satisfied: One, that the fact you are asked to draw the inference from has itself been proven beyond a reasonable doubt; and that the inference that has to be drawn is not only logical and reasonable but is strong enough so that you can find it is more probable than not that the fact inferred is true." The trial court thereafter summarized its instructions concerning circumstantial evidence: "[I]t's all right to draw inferences if you conclude that the facts proven reasonably establish other facts by reason of logic and are not the result of speculation, surmise, or guesswork. If from the facts you find proven you reasonably could infer other facts, you may then use the facts inferred for a basis of further inferences that other facts exist." The defendant did not object to the instructions at trial. On appeal he contends that the use of the more probable than not standard and the reference to reasonable inference unconstitutionally diluted the state's burden of proof.

In resolving challenges to jury instructions regarding circumstantial evidence we have established a bifurcated standard of review. " 'Where the principal factual issue at trial is intent, which is typically proven by circumstantial evidence, "we will closely scrutinize the court's instructions" on circumstantial evidence, in isolation from the remainder of the charge, to determine

whether the court misled the jury as to the state's burden of proof.' *State* v. *Robinson,* 204 Conn. 207, 210, 527 A.2d 694 (1987). Unlike intent, such issues as identity and whether the crime charged has occurred, are ordinarily proved by direct testimony with circumstantial evidence playing a subordinate role. 'Accordingly, we review the court's instruction not in isolation, but in the context of the charge as a whole, to determine whether it is " 'reasonably possible that the jury was misled' " by an erroneous explanation regarding the use of circumstantial evidence.' Id." *State* v. *McDonough,* supra, 358.

The defendant seeks to invoke the close scrutiny standard by claiming that his intent was a principal issue at trial. With regard to the attempted assault charges, he points out that they related to conduct after he had received a severe blow to his head and argues that the disputed issue was whether the defendant intended, after being hit, to cause serious physical injury or merely to frighten the employees so that they would cease beating him. According to the defendant, it was questionable whether he could have formed the requisite intent for attempted assault after he had been hit on the head; the fact of the blow put the defendant's intent into issue when it might otherwise not have been. With regard to the kidnapping and attempted robbery charges, the defendant contends that because such crimes require specific intent, the defendant's intent was necessarily in issue. Despite the defendant's argument to the contrary, from our review of the record, however, we agree with the state that, at trial, the principal factual issue was identification and not intent, even with regard to those charges requiring the state to establish specific intent. Furthermore, most of the evidence at trial was not circumstantial but consisted of direct testimony of the victims at the scene of the crimes. See *State* v. *McDonough,* supra, 359. Accord-

ingly, we review the court's instructions in the context of the charge as a whole to determine whether it is " ' "reasonably possible that the jury was misled." ' " Id., 358; *State* v. *Robinson,* supra.

Although we have previously held instructions allowing jurors to draw reasonable or logical inferences not to be erroneous; *State* v. *Silano,* 204 Conn. 769, 774, 529 A.2d 1283 (1987); we agree with the defendant that the trial court's use of the "more probable than not" language in this case was erroneous. *State* v. *McDonough,* supra, 355. Nevertheless, we conclude that, considered in the context of the charge as a whole, it is not reasonably possible that the jury was misled as to the state's burden of proof. Upon giving the erroneous instruction, the court stressed that the state had the burden of proving each element of every crime charged beyond a reasonable doubt. The court reiterated this instruction on two subsequent occasions. The court also stated at least a dozen times that to convict the defendant the jury had to find him guilty beyond a reasonable doubt. As to the offenses requiring specific intent, the court's instructions were accurate statements of the law. In the context of these instructions, the error in the instruction regarding circumstantial evidence was harmless beyond a reasonable doubt.

There is no error.

In this opinion HEALEY, GLASS and HULL, Js., concurred.

CALLAHAN, J., concurring. I concur in the result. I disagree with the opinion, however, to the extent that it finds the "more probable than not" standard for drawing inferences erroneous. I believe that that standard embodies a technically correct statement of the law. *Reliance Ins. Co.* v. *Commission on Human Rights & Opportunities,* 172 Conn. 485, 489–90, 374 A.2d 1104

(1977); *State* v. *Gonski,* 155 Conn. 463, 467–68, 232 A.2d 483 (1967); *State* v. *Foord,* 142 Conn. 285, 293–95, 113 A.2d 591 (1955). The instruction may possibly result in error if it is given in proximity to, or is juxtaposed with, an instruction on the requirement that the state prove all the elements of a crime beyond a reasonable doubt, because it may confuse or mislead the jury as to the state's burden. See *State* v. *Reddick,* 197 Conn. 115, 130–33, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). I do not believe, however, that to be the claim here. The claim, as I understand it, is that the instruction is erroneous per se.[1]

Further, I see no need to apply a strict scrutiny standard and to review this jury instruction in isolation from the rest of the charge where intent is concerned.[2] Even if we continue to regard the charge as erroneous, I do not see that it constitutes a greater hazard than other possible errors in jury instructions which we view in the context of the charge as a whole. I think that the last thing we need is another standard of review for jury instructions.

I also disagree with the trial court's instruction that facts from which inferences are drawn must be proved beyond a reasonable doubt. That portion of the trial court's instruction, which I believe is erroneous, was not an issue here and consequently was not addressed by the majority opinion. I think it should be mentioned, however, lest approval be indicated by default. The

---

[1] I do not advocate the use of such an instruction, particularly in view of the existing confusion as to its import. It would be preferable simply to inform the jury when discussing circumstantial evidence that they may draw reasonable and logical inferences from the facts proved. *State* v. *Brown,* 169 Conn. 692, 695, 364 A.2d 186 (1975).

[2] The authority for this proposition is recent, commencing with the Appellate Court's interpretation of *State* v. *Rodgers,* 198 Conn. 53, 58, 502 A.2d 360 (1985), in *State* v. *Farrar,* 7 Conn. App. 149, 155, 508 A.2d 49, cert. denied, 200 Conn. 805, 512 A.2d 229 (1986).

state's burden of proof beyond a reasonable doubt applies only to the essential element or elements of a crime, not to any evidentiary fact. " 'Burdens of proof never operate on evidence; they operate on the *ultimate facts or elements* that the evidence is offered to prove.' (Emphasis added.) *United States* v. *Viafara-Rodriguez*, [729 F.2d 912, 913 (2d Cir. 1984)]." *State* v. *McDonough*, 205 Conn. 352, 363, 533 A.2d 857 (1987). (*Callahan, J.*, concurring). The evidentiary facts from which inferences may be drawn do not have to be proven beyond a reasonable doubt any more than do other evidentiary facts. Id.