STATE OF CONNECTICUT *v.* ANTHONY FISHER
(AC 18314)

O'Connell, C. J., and Lavery and Landau, Js.[1]

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 18—officially released April 18, 2000

*Kirstin B. Coffin,* special public defender, for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Rosita M. Creamer,* senior assistant state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Anthony Fisher, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (5)[2] and carrying a pistol without a permit in violation of General Statutes § 29-35.[3] On

---

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[3] General Statutes § 29-35 provides: "(a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to

appeal, the defendant claims that the trial court improperly (1) permitted the state to introduce evidence of (a) prior altercations between the defendant and the victim, and (b) a prior, unrelated injury to the victim, (2) allowed the state to exercise a peremptory challenge and denied his *Batson*[4] challenge, (3) prevented him from presenting a defense during the testimony of a witness and (4) exercised its discretion when it denied his motion to discharge counsel and his counsel's request to withdraw.[5] We affirm the trial court's judgment.

The jury reasonably could have found the following facts. The defendant and the victim became engaged to be married in December, 1993, some seven months after they met. Problems plagued their relationship, which deteriorated rapidly in the six months prior to the defendant's shooting the victim. The defendant knew that one of the victim's arms was partially paralyzed due to an accident. The couple argued and fre-

or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33.

"(b) The holder of a permit issued pursuant to section 29-28 shall carry such permit on his person while carrying such pistol or revolver."

[1] *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[5] The defendant was acquitted of the charge of criminal attempt to commit murder in violation of General Statutes §§ 53a-54a and 53a-49 (a) (2).

quently fought physically. When their disagreements erupted into physical altercations, it was not uncommon for the defendant to grab and restrain the victim. On one occasion, the defendant threatened to "flood" the house by cutting open a waterbed. The police were summoned. They asked the defendant to leave and arrested him when he became belligerent.

In August, 1995, after the victim announced her plans to go out for the evening with some female friends, the defendant put his .45 caliber handgun to her head. The defendant eventually left the home, saying he was going to confront the victim's girlfriend, whom he blamed for the victim's behavior. As a result of this incident, the defendant ceased living with the victim. Thereafter, he telephoned the victim at work and at home constantly. On September 13, 1995, the day before the shooting, the defendant again called the victim, yelling and blaming her for his problems. The next day, just after the victim had driven her son to school, the defendant caused his automobile to strike the victim's vehicle, making it spin. When the victim got out to survey the damage, she saw the defendant pointing his handgun at her. He fired, striking the victim in the forehead and knocking her to the ground. As she lay there, the defendant fired a second shot, striking her in the shoulder, and a third shot, which went into her neck and took off a portion of her ear as it exited her body. The automobile accident was witnessed by a third party, who also saw the defendant with a gun and heard shots.

The victim was taken to a hospital, where she was treated for her injuries. At the scene, the police recovered three spent .45 caliber cartridges, which were determined to have been fired from the gun the defendant surrendered to the police several days after the shooting. The defendant had no permit for the gun. After his arrest, trial and conviction, the defendant appealed.

I

The defendant's initial assertion consists of two evidentiary claims involving the admission of testimony regarding (1) prior altercations between him and the victim, and (2) an injury to the victim's arm. It is well settled that the trial court's ruling on the admissibility of evidence is entitled to great deference. See *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991); *State* v. *Sharpe*, 195 Conn. 651, 659, 491 A.2d 345 (1985). "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).

A

The defendant's first claim is that the court improperly admitted evidence of altercations between the defendant and the victim prior to the shooting. We disagree.

At trial, the defendant objected on the grounds of relevance and undue prejudice when the state asked the victim whether "something happened in [her] relationship [with the defendant] prior to September 14th, 1995." The state claimed the evidence was relevant to motive, intent, course of conduct and the defendant's way of behaving on the day of the shooting. Defense counsel agreed. After the court overruled the objection, the victim testified about the couple's turbulent rela-

tionship, including the altercation involving a gun that occurred in late August, 1995. When he objected to the admission of evidence concerning the victim's injury to her arm, defense counsel conceded that evidence of verbal and physical fights between the defendant and the victim was relevant.[6]

The defendant's concession as to the admissibility of altercations between him and the victim is correct under our law. "It is well settled that evidence of prior misconduct is admissible for the limited purposes of showing intent, an element in the crime, identity, malice, motive or a system of criminal design." (Internal quotation marks omitted.) *State* v. *Cepeda*, 51 Conn. App. 409, 430, 723 A.2d 331, cert. denied, 248 Conn. 912, 732 A.2d 180 (1999). "Evidence of prior threats by a defendant directed to his victim has been held relevant to the issues of intent and motive. See, e.g., *State* v. *Veal*, 201 Conn. 368, 375, 517 A.2d 615 (1986); *State* v. *Falby*, 187 Conn. 6, 23, 444 A.2d 213 (1982)." *State* v. *Cepeda*, supra, 430. Furthermore, because the defendant conceded to the admission of evidence concerning prior disputes with the victim, the claim is not reviewable on appeal. See *State* v. *Maisonet*, 16 Conn. App. 89, 97, 546 A.2d 951, cert. denied, 209 Conn. 816, 550 A.2d 1086 (1988), cert. denied, 489 U.S. 1014, 109 S. Ct. 1127, 103 L. Ed. 2d 189 (1989).

B

The defendant also claims that the court improperly admitted evidence of the victim's injured arm because

---

[6] In objecting to the admission of evidence concerning the victim's arm injury, defense counsel stated: "See, the problem, Your Honor, is it's again been bootstrapped. You have this evidence [of prior arguments and altercations], which I can see would probably be admissible otherwise; yet, she's trying to tie to it some preexisting injury, which somehow, naturally, would affect the witness' behavior during whatever altercations are being testified to. But what is the probative value? *I can see the claim of disputes, anything the defendant might have said or the way he acted, if it's not too remote, to go to intent or motive.* But now what we have, essentially, is the additional

it had no probative value and only served to stir the jury's emotions. We do not agree.

The defendant objected when the state asked the victim whether "prior to getting shot, did you have some sort of injury that incapacitated you in some way?" After the objection was overruled, the victim testified that she had sustained a crushing injury to her left arm in an accident. When the state sought to inquire what happened when the altercations between her and the defendant became physical, the defendant objected again, and the jury was excused from the courtroom. The defendant's counsel argued that evidence of the prior injury was irrelevant. See footnote 6.

The court properly admitted the evidence concerning the victim's preexisting arm injury. It was relevant, first, because it tended to impeach the defendant's testimony that it was the victim, not he, who was the primary physical aggressor. Second, the evidence demonstrated that the defendant's need to control the victim was so strong that it caused him to exploit her physical injury. Jurors might reasonably have concluded that such a need motivated the defendant to take the drastic action of shooting the victim when faced with the prospect of losing her. The trial court properly exercised its discretion in admitting the evidence.

## II

In his second claim, the defendant maintains that the court improperly permitted the state to peremptorily challenge an African-American member of the venire panel in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). In *Batson*, the United States Supreme Court concluded that the federal equal protection clause forbids the prosecutor to chal-

effort to portray the defendant as a person who is willing to have an altercation with someone who has a disability." (Emphasis added.)

lenge peremptorily potential jurors solely on account of their race.[7] "[A] trial court's determination that there has or has not been intentional discrimination is 'entitled to appropriate deference' upon review on appeal. Id. [98 n.21.]" *State* v. *Gonzalez,* 206 Conn. 391, 395, 538 A.2d 210 (1988).

On appeal, the defendant claims that the state's excusal of an African-American venireperson amounted to purposeful racial discrimination. After the defendant proffered his *Batson* challenge, the state advanced a race neutral response.[8] The court responded that it had

---

[7] *Batson* set out a three step process by which claims of discriminatory peremptory challenges are to be determined under the federal constitution. First, the defendant, who is a member of a cognizable racial group, must make a prima facie showing that the state has exercised peremptory challenges on the basis of purposeful racial discrimination. Second, if that showing is made, the burden shifts to the state to articulate a race neutral explanation for striking the jurors of the defendant's race. Third, the defendant then has an opportunity to demonstrate that the state's reasons are insufficient or pretextual. The trial court must then determine whether the defendant has met his burden of proving purposeful discrimination by a preponderance of the evidence. *Batson* v. *Kentucky,* supra, 476 U.S. 96–98.

Under Connecticut law, there is no requirement that a defendant contesting the use of the peremptory challenge need establish a prima facie case of purposeful discrimination. *State* v. *Holloway,* 209 Conn. 636, 646 n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). The state, however, must "provide the court with a prima facie case response consistent with the explanatory mandate of *Batson.*" Id., 646.

. [8] In response to the defendant's *Batson* challenge, the prosecutor said in part: "With respect to the defendant's request, I would note the following: That this venireperson has a brother who has been arrested; that he apparently has studied and taught matters related to law and race; he is concerned about the issue of justice as it affects black people; and he's undertaken, apparently, a statistical study of the criminal justice system and statistical correlations involving people of a black race.

"He has noted that he's troubled because [he has] concluded that the system is unfair to blacks; that they are convicted more often and punished more severely according to statistics he has studied.

"He acknowledged [that] his attitude on a jury would be different in a case where there was not a black defendant. With a black defendant, he would view the evidence more scrupulously, being more attentive. He indicated he identifies with blacks, would be especially attuned to situations where blacks are involved.

"listened very carefully to [the venireperson's] testimony. And also the reasons given by the state. The court will deny the *Batson* challenge, and I refuse to seat [him]." The defendant said nothing, and the venireperson was excused.

The defendant waived his right to raise this claim on appeal because he made no effort to show the existence of purposeful racial discrimination in response to the state's explanation and, therefore, implicitly accepted the state's proffered race neutral reasons. See *State* v. *Beltran*, 246 Conn. 268, 280, 717 A.2d 168 (1998); *State* v. *Cepeda*, supra, 51 Conn. App. 426–27. This claim, therefore, must fail.[9]

## III

The defendant's third claim is that his right to present a defense was impaired. He complains that interruptions during the direct testimony of Peter Zeman, an expert witness, concerning the results of Zeman's psychiatric examination of the defendant were improper. The defendant points to three incidents that occurred during Zeman's testimony.[10] In none of those exchanges

"In short, the challenge is not for his race. The court can find it is for—the conclusions that he has come to do not necessarily have to be conclusions or views of a black person, but somebody who has studied what he has said he studied and come to those conclusions."

[9] The defendant did make a claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), in his reply brief. We have repeatedly stated that a reply brief is an improper venue for such a claim. *Golding* may not be raised for the first time in a reply brief, as that procedure does not provide the state with an opportunity to reply to the claim. See Practice Book §§ 60-2 and 60-5; *State* v. *Jones*, 34 Conn. App. 807, 815, 644 A.2d 355, cert. denied, 231 Conn. 909, 648 A.2d 158 (1994). Moreover, *Golding* and its progeny do not provide for review of *waived claims* that are not of constitutional magnitude. *State* v. *Bonsu*, 54 Conn. App. 229, 236–37, 734 A.2d 596, cert. denied, 251 Conn. 909, 739 A.2d 1249 (1999).

[10] The following exchanges occurred during Zeman's direct testimony:

"[Defense Counsel]: Now, I noticed, in preparing your report, that you indicated on page three, in the second—actually, the first full paragraph, that [the defendant] at first denied—

did defense counsel voice an objection and, in only one exchange, the first, did the court actually issue a ruling. This garden variety claim of evidentiary impropriety, robed in constitutional garb, is without merit. It came about when defense counsel, not the witness, began to read from a document not in evidence. The court's ruling was entirely appropriate because it is improper to read from a document not in evidence. *State* v. *De Santis*, 178 Conn. 534, 545, 423 A.2d 149 (1979); *Robinson* v. *Faulkner*, 163 Conn. 365, 373, 306 A.2d 857 (1972); *Shulman* v. *Shulman*, 150 Conn. 651, 662, 193 A.2d 525 (1963); see also *M. J. Daly & Sons, Inc.* v. *New Haven Hotel Co.*, 91 Conn. 280, 291–92, 99 A. 853 (1917); *Mezes* v. *Mead*, 48 Conn. App. 323, 329, 709 A.2d 597 (1998).

---

"[Prosecutor]: I'm going to object to reading from the report, Your Honor. The report isn't in [evidence]. I don't know that it's going to get in.

"The Court: Sustained.

\* \* \*

"[Prosecutor]: I notice the doctor's reading from something, Your Honor. I would object to that.

"The Court: Was it used to refresh your recollection, doctor?

"Witness: It was. I really wasn't reading from it, but I'll avoid it.

"The Court: Thank you.

"Witness: He then went back to—

"[Prosecutor]: Again, Your Honor, I don't know what Dr. Zeman has in front of him, but he keeps glancing down at his report, apparently, and answering these questions.

"Witness: Why don't we settle this and—

"[Prosecutor]: Excuse me, Dr. Zeman. I would ask that the witness be instructed not to read from anything, including his report, when he's answering questions. If he can't answer a question and needs to refresh his recollection, then that should be made known to the court.

"The Court: Thank you. The doctor has put his report away, so that should meet compliance with your request."

The defendant also points to the following exchange between the prosecutor and Zeman during cross-examination:

"[Prosecutor]: So what you were saying, then, wasn't necessarily significant personal history. You were just reciting the information about the defendant's personal history that you got from him?

"Witness: I was beginning to and didn't get into it in great detail because of the constraints on me."

## IV

In his fourth and final claim, the defendant asserts that the court improperly denied his motion to discharge counsel and counsel's request to withdraw. We are not persuaded.

Some two weeks prior to the commencement of voir dire, the defendant filed a pro se motion to discharge his public defender and to appoint new counsel, the gist of which reflected his belief that defense counsel was ignoring him, was not properly preparing his case and was sympathetic to the victim. During the hearing on his motion, the defendant said he was "not happy with the way things are going." The court, *Clifford, J.*, told the defendant that he was free to hire any attorney he wanted, but that his right to appointed counsel did not include an unlimited choice of an attorney. The court concluded that no exceptional circumstances existed to justify discharging defense counsel on the eve of trial and denied the motion.

On the day voir dire began, the defendant again asked that his counsel be removed, adding to his previously stated reasons that his counsel was getting "some kind of kickback or something from the state or from the victim" and was "sending me up the river." Defense counsel disagreed on the record with the defendant's argument. The voir dire process continued and then, on the first day of trial, the defendant again expressed his dissatisfaction with his counsel. The court, *Norko, J.*, explained to the defendant that he had a right to represent himself and began a canvass to make sure the defendant understood what flowed from that decision. The defendant concluded that he was not prepared to proceed pro se and elected to be represented by his attorney. Following a brief sidebar conference, defense counsel moved that he be discharged, which was denied

by the court, and the evidentiary portion of the trial began.

The standard of reviewing both a motion by a defendant to discharge counsel and a motion by counsel to withdraw is the same. See *State* v. *Patavino*, 51 Conn. App. 604, 608–609, 724 A.2d 514, cert. denied, 249 Conn. 919, 733 A.2d 236 (1999). It is within the trial court's discretion to determine whether a factual basis exists for appointing new counsel and, absent a factual record revealing an abuse of that discretion, the court's refusal to appoint new counsel is not improper. *State* v. *Crenshaw*, 210 Conn. 304, 314, 554 A.2d 1074 (1989). Moreover, appellate tribunals "look with a jaundiced eye at complaints regarding adequacy of counsel made on the eve of trial . . . ." *State* v. *Robinson*, 227 Conn. 711, 726, 631 A.2d 288 (1993). Such a request must be supported by a substantial reason and, "[i]n order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances." (Internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 424, 680 A.2d 147 (1996).

We have examined the record, which fails to reveal any facts supporting a conclusion that defense counsel was laboring under any allegiance to the state or the victim. The record also fails to substantiate any of the other allegations leveled by the defendant against his trial counsel. The defendant's decision to testify and the decision to present a defense of amnesia necessarily required effective and meaningful communication between the defendant and trial counsel.[11] We conclude that the trial courts did not abuse their discretion when

---

[11] The record before us indicates that to the extent that there was any breakdown in communication between defense counsel and the defendant, that breakdown was of the defendant's own making and, therefore, cannot form the basis of a claim to remove counsel. See *State* v. *Gonzalez*, 205 Conn. 673, 684, 535 A.2d 345 (1987).

they refused to appoint new counsel and denied counsel's motion to withdraw.

The judgment is affirmed.

In this opinion the other judges concurred.