******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JOHN CORVER
## (AC 40239)

Prescott, Elgo and Bear, Js.

*Syllabus*

Convicted of the crimes of attempt to commit murder, assault in the first
degree and kidnapping in the first degree, and of being a persistent
dangerous felony offender, the defendant appealed. He claimed that the
trial court improperly denied his request to discharge his counsel on
the day before jury selection was to begin, and that he did not knowingly,
intelligently and voluntarily waive his right to a jury trial. *Held*:

1. The trial court did not abuse its discretion in denying the defendant's
   request to discharge his counsel, that court having reasonably deter-
   mined that the defendant did not demonstrate any substantial reason
   or exceptional circumstances that warranted the discharge of his counsel
   on the eve of jury selection; no issue or complaint had been raised with
   respect to counsel's representation of or relationship with the defendant
   prior to a hearing held the day before the commencement of jury selec-
   tion, as they had appeared before the court on several previous occasions
   over many months, including the week preceding the request to dis-
   charge, the transcripts of those court proceedings reflected cooperation
   and ample communication between the defendant and his counsel, and
   the trial court, having been in a superior position to observe the interac-
   tions between them, reasonably could have concluded that the request
   to discharge filed on the eve of trial was an attempt by the defendant
   to forestall his decision on whether to elect a court trial, and, notwith-
   standing the defendant's claim of tension with his counsel because of the
   defendant's limited resources, a complete breakdown in communication
   between them had not transpired, as the defendant did not request
   the appointment of a public defender but continued with his privately
   retained counsel throughout the court trial.

2. The defendant could not prevail on his unpreserved claim that he did not
   knowingly, intelligently and voluntarily waive his right to a jury trial
   due to a breakdown in communication with his counsel and the trial
   court's refusal to grant him a continuance to consider whether to elect
   a court trial: the totality of the circumstances demonstrated that a
   complete breakdown in communication did not occur, and that the
   defendant's waiver of his right to a jury trial was knowing, intelligent
   and voluntary, as he and his counsel communicated in an effective
   manner throughout the proceeding in which the defendant elected a
   court trial, and there was little merit to the defendant's contention that
   his waiver was not the product of a free and meaningful choice due to
   the denial of the continuance, as the court went to great lengths to
   communicate to him that even if he began selecting a jury, he still could
   elect to waive a jury trial and proceed with a court trial; moreover, the
   defendant was represented by counsel when the court canvassed him
   twice on whether he wanted to waive a jury trial, the court having
   terminated the first canvass when he equivocated and informed him
   that it would not accept a waiver unless it was knowing, intelligent, and
   voluntary, and the defendant's statements during the second canvass
   having indicated that he understood the court's questions and not having
   revealed hesitation or involuntariness.

Argued January 30—officially released June 12, 2018

*Procedural History*

Two part substitute information charging the defen-
dant, in the first part, with four counts of the crime of
attempt to commit murder, two counts of the crime of
assault in the first degree and the crime of kidnapping
in the first degree, and, in the second part, with being
a persistent dangerous felony offender, brought to the
Superior Court in the judicial district of Tolland, where

the, court, *Oliver, J.*, denied the defendant's motion to discharge counsel; thereafter, the first part of the information was tried to the court, *Graham, J.*; finding of guilty of three counts of attempt to commit murder, two counts of assault in the first degree and kidnapping in the first degree; subsequently, the defendant was presented to the court, *Oliver, J.*, on a conditional plea of nolo contendere to the charge of being a persistent dangerous felony offender; thereafter, the court, *Graham, J.*, rendered judgment of guilty in accordance with the finding and plea, from which the defendant appealed. *Affirmed.*

*Joseph G. Bruckmann,* public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Merav Knafo*, certified legal intern, for the appellee (state).

*Opinion*

ELGO, J The defendant, John Corver, appeals from the judgment of conviction, rendered after a court trial, of three counts of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a, two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A). On appeal, the defendant claims that (1) the trial court abused its discretion in denying a request to discharge his legal counsel and (2) his conviction must be reversed because he did not knowingly, intelligently, and voluntarily waive his right to a jury trial. We affirm the judgment of the trial court.

On the basis of the evidence adduced at trial, the court reasonably could have found the following facts.[1] In April, 2014, the defendant's wife, K,[2] traveled to California to visit her mother and attend a dog show. While in California, K informed the defendant that she wanted to end their marriage. When the defendant picked her up at Bradley International Airport in Windsor Locks on the evening of April 23, 2014, he was very aggravated. Once inside her vehicle, the defendant begged her not to leave him. When K indicated that their marriage was over, the defendant, who was operating the vehicle, grew even more agitated. Concerned that the "situation was getting out of control," K attempted to call a friend. In response, the defendant grabbed her cell phone and tossed it out the window. The defendant then retrieved a knife from the driver's side door and began stabbing K on the left side of her body. While doing so, the defendant repeatedly told K that he loved her and did not want to hurt her, but that he was going to kill her for ruining his life.

K, who was bleeding from her injuries, asked the defendant to take her to a hospital or to let her out of the vehicle. The defendant refused to do so. Instead, he took her to a secluded area of the Nathan Hale Homestead (homestead) in Coventry, where he parked and exited the vehicle. He then opened K's passenger side door and again stabbed her multiple times. As he did so, the defendant continuously told K that her loved her, but was going to kill her.

The defendant then returned to the driver's side of the vehicle and left the homestead. As he drove around Coventry, K "was not doing well" and felt "[v]ery weak." The defendant ultimately returned to the same secluded area of the homestead and parked the vehicle. The defendant then stuffed a rag inside the gas tank of the vehicle and attempted to set it on fire. When those efforts proved unsuccessful, the defendant stabbed himself in the stomach and then tried to strangle himself, but to no avail. He then called a friend, Mike Theirer, and told him that he had stabbed K and that

"[t]his is the end."[3] Theirer then contacted the police and informed them that the defendant had just told him that he had stabbed his wife. During that phone call, a recording of which was admitted into evidence and played at trial, Theirer stated that he heard K "screaming in the background" during his conversation with the defendant.[4]

The defendant once again drove away from the homestead. He handed the knife to K and asked her to stab him, telling her that they "both were going to die . . . ." K took the knife and dropped it out of the vehicle. At that point, the defendant accelerated and said, "Here we go, baby. We're both going to die now . . . ." The defendant then drove the vehicle into a large tree.

When a passerby spotted the vehicle against the tree, she stopped her vehicle and immediately called 911. Melinda Hegener, an emergency medical technician and the assistant chief of the Andover Volunteer Fire Department, first responded to the scene. Hegener testified at trial that K was "very pale" and "covered in blood . . . ." Hegener at that time believed that if K "didn't get medical attention soon . . . she would probably [pass] out and die." K was transported by helicopter to Hartford Hospital, where she remained for approximately two weeks while undergoing multiple surgeries.

The defendant thereafter was arrested and charged, by substitute information, with four counts of attempt to commit murder, two counts of assault in the first degree, and one count of kidnapping in the first degree. A court trial was held in November, 2015, at the conclusion of which the court, *Graham*, *J.*, acquitted the defendant on one count of attempt to commit murder and found him guilty on all other counts.[5] The court sentenced the defendant to a total effective term of thirty-eight years incarceration, and this appeal followed.

I

The defendant first claims that the court abused its discretion in denying a request to discharge his legal counsel, Attorney Ryan E. Bausch, due to a breakdown in communication that was made on the eve of jury selection. We disagree.

The following additional facts are relevant to the defendant's claim. Although a public defender initially was appointed to represent the defendant due to his failure to post bond, Bausch filed an appearance as his privately retained attorney on July 18, 2014. The case was continued multiple times while the defendant reviewed discovery and discussed a possible plea deal with the state. On May 8, 2015, the state advised the court, *Oliver*, *J.*, that although it had been discussing a plea offer with the defendant for "a number of months," it did not believe that those discussions were

"going to be fruitful." Accordingly, the state suggested that the case should be moved to the jury trial list. In response, Bausch requested a judicial pretrial conference and indicated that the defendant "wants to speak with me before [it] actually occurs." The court granted that request, and a pretrial was held on June 5, 2015.

When the parties appeared before the court, *Bright, J.*, on July 31, 2015, Bausch began his remarks by stating that he had "talked to [the defendant] numerous times since the [pretrial conference] regarding the [plea] offer . . . ." After acknowledging that "today is the accept-or-reject date," Bausch requested a further continuance to permit him to review with the defendant additional discovery regarding certain telephone records. In response, the state's attorney reminded the court that almost two months had passed since the pretrial conference and opined that the telephonic evidence was "an inconsequential matter" and "an excuse to get another continuance." The court nevertheless granted a continuance until August 14, 2015, at which time the court cautioned the defendant that he was "either going to take the offer, or it's going to go to trial."

At the August 14, 2015 hearing, Bausch informed the court, *Bright, J.*, that he had discussed the plea offer with the defendant, stating that "we went over everything," and communicated the defendant's desire to reject that offer and proceed to trial. The court canvassed the defendant on that decision. During that canvass, the defendant confirmed that he had discussed the matter with Bausch, and was aware of both the potential maximum sentence in the case and the state's intent to add additional charges that would increase the maximum possible sentence. When asked if he had had sufficient time to talk with Bausch about "all of your options," the defendant replied, "About the existing charges. I don't know about the future charges." When Bausch responded, "I went over," the transcript then indicates that a discussion was held off the record. The court thereafter placed the matter on the firm trial list and informed the parties that a trial would commence in either October or November, 2015. As a final matter, Bausch asked the state to provide another copy of the list of potential additional charges, stating that he "had some trouble reading" the copy that the state previously provided.

The defendant next appeared in court on Friday, October 23, 2015, at which time the state filed a substitute information that contained eight counts, including a charge of kidnapping in the first degree. At the outset of that proceeding, the state's attorney indicated that the parties had met with *Hon. James T. Graham*, who was scheduled to preside over the defendant's upcoming trial, earlier that day, and that Judge Graham had "indicated to counsel that . . . the defendant has until Monday to decide whether to elect a court trial or a

jury trial."[6] In response, Bausch submitted certain documents, including a psychological evaluation of the defendant, to the court. Bausch asked the court, *Oliver, J.*, to review those documents and decide whether an additional pretrial conference was warranted. In response, the state indicated that it was ready to proceed, and reminded the court that a pretrial conference was held months earlier and that this new report was provided "at, literally, the eleventh hour here, right before a trial . . . ." The court nonetheless agreed to review the report and determine whether a further pretrial conference was appropriate.

At the state's request, the court then canvassed the defendant on the part B information that recently was filed, which charged him with being a persistent dangerous felony offender. See footnote 5 of this opinion. During that canvass, the defendant confirmed that he understood that he was charged, under the substitute information, with four counts of attempt to commit murder, as well as with assault and kidnapping charges. The court also asked the defendant if he had any questions for Bausch about "the new charges" contained in the substitute information; the defendant replied, "[n]o." The court then continued the matter until Monday, October 26, 2015, "for a canvass on [the defendant's] decision to have his trial before either a jury or [a] court trial."

When the parties appeared on October 26, 2015, Bausch immediately informed Judge Oliver that the defendant wanted to discharge him as legal counsel. The defendant then told the court that he had fired Bausch. Before addressing that issue, the court stated that it had reviewed the materials furnished by Bausch on Friday and had concluded that an additional pretrial conference was not warranted.

The court then asked the state's attorney if he had anything to say. The state's attorney responded that "it seems awfully suspicious . . . that on the eve of trial [the defendant is] attempting to do this" and suggested that the request to discharge was a dilatory tactic. For that reason, the state's attorney opined that the court "should not let [Bausch] out of this case." In response, the court noted that, barring the defendant's waiver of his right to a jury trial, jury selection was scheduled to begin the next day.

Bausch then made an oral motion to withdraw from the case due to a breakdown in communication with the defendant, stating that the defendant had "no interest in assisting me or communicating with me" and opining that their communications were "in complete disarray." The court then asked the defendant to provide the basis for his request that Bausch be discharged. The defendant stated that "we've been having issues with how to approach this case," as monetary issues had arisen due to the defendant's limited resources, which created

"tension" between the two. As the defendant stated, he did not have "any more money to give him and we are down to the last minute. . . . [T]here's no money for investigators, there's no money for—the mental health exam you got was done last minute . . . ." At no time did the defendant express either a desire to represent himself or to have new counsel appointed. Bausch then clarified, with respect to those monetary issues, that "[i]t wasn't about me being paid money. What [the defendant is] referring to is about money for investigators, mental health [examinations] . . . ."

The court then observed that the principal basis for the request to discharge concerned "money and the things that [it] buys in relation to a criminal defense," and noted that a defendant is not guaranteed, "whether [represented by private counsel] or a public defender, a bottomless pit of money with which to launch an investigation and put on a defense." With respect to the defendant's purported disinterest in cooperating with Bausch, the court stated, "That is his option. I haven't heard anything that says he is unable to. Whether [the defendant] chooses to do that is up to him in the face of a criminal prosecution . . . ." The court then addressed the defendant, stating: "I have let everyone say everything they wanted to say in terms of a basis for granting the oral motion to dismiss, and I've asked anything else, anything else, anything else, and *what I have not heard is an actual basis to remove counsel and either have you represent yourself, which you certainly could, or appoint new counsel, or give you time to retain separate counsel*." (Emphasis added.) The court informed the defendant that "[i]t's always your option if you want to hire another attorney and have that attorney file an appearance in lieu of [Bausch], and then ask for a continuance . . . and have that request granted or not; but as to a basis for removing [Bausch in light of the state's] suspicions about the basis being to delay, there's no basis to remove counsel, so that request is denied." The court further remarked that "if anyone . . . listens to a recording of [the] Friday [October 23, 2015 hearing] or reads a transcript, no one's going to see any clue that there was any discord between the two of you . . . ."

The court then reminded the defendant that, unless he elected to proceed with a court trial, jury selection would begin the next day, October 27, 2015. At that point, the defendant stated that Bausch had told him he would not be calling any witnesses for him due to a lack of funds. In response, the court stated: "I'm not hearing anything further in support of your request to remove your attorney, and the trial strategy between the two of you is the trial strategy between the two of you. I can tell you, though . . . in cases of this nature, it is not unusual not to call defense witnesses [and] to [leave] the state to their proof . . . ." Whether to put on witnesses as part of a criminal defense, the court

explained, was "a trial strategy decision . . . ." The defendant then complained that, in various discussions with Bausch that occurred on "several different times," Bausch had not provided "the same consistent answer" as to whether he was planning to call witnesses on the defendant's behalf. In response, the court explained that "an attorney who cannot adapt cannot effectively represent their client, so things do change." Discussion then followed on the question of whether the defendant wanted to waive his right to a jury trial, and the defendant ultimately decided to proceed with a court trial.

On appeal, the defendant claims that the court improperly denied the motion to discharge Bausch as counsel. The parties submit, and we agree, that appellate review of that determination is governed by the abuse of discretion standard. See *State* v. *Gonzalez*, 205 Conn. 673, 683, 535 A.2d 345 (1987) ("we conclude that the trial court did not abuse its discretion in not permitting the defendant to discharge his attorney").[7] Pursuant to that standard, we make every reasonable presumption in favor of the correctness of the trial court's ruling. See *State* v. *Williams*, 317 Conn. 691, 710 n.17, 119 A.3d 1194 (2015). In the present case, both the defendant and Bausch requested, at the outset of the October 26, 2015 hearing, that Bausch be relieved of his representation in the present case. As this court has observed, "[t]he standard of reviewing both a motion by a defendant to discharge counsel and a motion by counsel to withdraw is the same. . . . It is within the trial court's discretion to determine whether a factual basis exists for appointing new counsel and, absent a factual record revealing an abuse of that discretion, the court's refusal to appoint new counsel is not improper. . . . Moreover, appellate tribunals look with a jaundiced eye at complaints regarding adequacy of counsel made on the eve of trial . . . . Such a request must be supported by a substantial reason and, [i]n order to work a delay by a last minute discharge of counsel there must exist exceptional circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Fisher*, 57 Conn. App. 371, 382, 748 A.2d 377, cert. denied, 253 Conn. 914, 754 A.2d 163 (2000).

Applying that standard to the record before us persuades us that the court did not abuse its discretion. We are particularly mindful of the context in which the motion to discharge counsel arose. In the previous year, numerous continuances had been granted and multiple pretrial conferences were conducted at the defendant's request. When the defendant appeared before Judge Oliver on Friday, October 23, 2015, he knew that jury selection was scheduled to begin the following week, and at that time requested a further pretrial conference, which was denied. The defendant appeared before Judge Oliver again on Monday, October 26, 2015, the day before the commencement of jury selection, at which time he requested Bausch's discharge. Prior to

that hearing, neither the defendant nor Bausch had raised any issue or complaint with respect to Bausch's legal representation or their relationship.

Significantly, the defendant and Bausch had appeared before Judge Oliver on several occasions over the course of many months, and as recently as the preceding Friday, October 23, 2015. The judge, therefore, was in a superior position to evaluate whether a complete breakdown in communication between the two had transpired, as Bausch suggested. During those proceedings, Judge Oliver had the opportunity to observe the interactions of the defendant and Bausch. In light of that perspective, it is telling that Judge Oliver, in denying the request to discharge, emphasized that "if anyone . . . listens to a recording of [the] Friday [October 23, 2015 hearing] or reads a transcript, no one's going to see any clue that there was any discord between the two of you . . . ."

The transcripts before us also reflect a good deal of cooperation between the defendant and Bausch prior to the request to discharge. When Bausch requested a pretrial conference when he appeared before Judge Oliver on May 8, 2015, he made clear that the defendant "wants to speak with me before [it] actually occurs." At the July 31, 2015 hearing, Bausch indicated that he had "talked to [the defendant] numerous times since the [June 5, 2015] pretrial" conference and then requested an additional continuance "to go over [a] last piece of evidence with [the defendant]." At the August 14, 2015 hearing, Bausch informed the court that he had discussed the plea offer with the defendant, stating that "we went over everything . . . ." When the defendant then rejected the state's plea offer, he confirmed during the court's canvass of him that he had discussed the matter with Bausch. The defendant further indicated that, on the basis of those discussions, he understood both his current exposure as well as the possibility that the state would file additional charges against him. The defendant at that time also acknowledged that he had been provided sufficient time to discuss with Bausch "all of [his] options" regarding the existing charges. Likewise, when Judge Oliver canvassed the defendant on the part B information on October 23, 2015, the defendant indicated that he understood the charges filed against him in the substitute information, as well as in the part B information. The defendant at that time also confirmed to the court that he had no remaining questions for Bausch about "the new charges" or the part B information.

Given that context, as well as Judge Oliver's firsthand observations of the defendant and Bausch, the court reasonably could conclude that a complete breakdown in communication between the two had not transpired, and that the request to discharge filed on the eve of jury selection was an attempt to forestall the defendant's

decision on whether to elect a court trial. To paraphrase *State* v. *Gethers*, 193 Conn. 526, 545, 480 A.2d 435 (1984), the record indicates that there was ample communication between the defendant and Bausch until the day the defendant requested his discharge. The court, in ruling on the request to discharge, properly could rely on its observations of the defendant and Bausch prior to that request. See *State* v. *Drakeford*, 202 Conn. 75, 84, 519 A.2d 1194 (1987) (expressly considering "the history of their relationship, the prior activity of the defendant's attorney on his behalf and the timing of the request" in concluding that trial court did not abuse its discretion in denying request to discharge); *State* v. *Rosado*, 52 Conn. App. 408, 430, 726 A.2d 1177 (1999) (noting that trial court "properly determined that there was not a complete breakdown of communication between the defendant and his counsel" in light of its firsthand observation of their interactions).

Although the defendant informed the court that the breakdown in communication with his counsel was attributable to "great tension" due to the defendant's limited resources, the court properly advised the defendant that the right to counsel does not entail the right to unlimited resources, even when represented by a public defender. See, e.g., *Smith* v. *Collins*, 977 F.2d 951, 960 (5th Cir. 1992) ("[t]he defense of a criminal case [does not] contemplate the employment of wholly unlimited time and resources"), cert. denied, 510 U.S. 829, 114 S. Ct. 97, 126 L. Ed. 2d 64 (1993); *United States* v. *Williams*, Docket No. 12-CR-0463 (JCM-VCF), 2013 WL 5954490, *4 (D. Nev. November 6, 2013) ("no criminal defendant has unlimited resources"). Furthermore, the record reveals that at no time during the October 26, 2015 hearing or thereafter did the defendant request the appointment of a public defender. Rather, he continued with his privately retained legal counsel throughout the six day court trial, during which Bausch called four witnesses, in addition to the defendant, as part of his defense.

The defendant also argues that a colloquy that occurred subsequent to the court's ruling on his request to discharge demonstrates a breakdown in communication with his legal counsel. When the defendant later that day expressed his desire for a court trial, the court canvassed him on that decision. During that canvass, the court reviewed, inter alia, the pending charges alleged in the substitute information. When the court referenced the four attempt to commit murder counts, the defendant interjected, "How is it four attempted murders?" After the state's attorney provided an overview of the discrete acts that formed the basis for those charges, the defendant replied, that he would "like to talk to my attorney" because he still did not understand why those acts gave rise to four distinct charges of attempt to commit murder. The court then provided the defendant the opportunity to discuss the matter

with Bausch. When that discussion concluded, Bausch informed the court that "I explained what I had to explain, Your Honor." The defendant thereafter expressed no further misapprehension of the four attempt to commit murder charges.

We disagree with the defendant's assertion that this colloquy demonstrates that communications between him and Bausch had completely broken down. To the contrary, a fair reading of that transcript indicates that Bausch and the defendant at that time continued to communicate in an effective manner. Moreover, we note that, when the defendant appeared before Judge Oliver the following day, he apologized to the court, stating, "I'm sorry about the confusion yesterday."

In light of the foregoing, we conclude that the trial court reasonably determined that the defendant had not demonstrated that any substantial reason or truly exceptional circumstances warranted the discharge of his legal counsel on the eve of jury selection. The court, therefore, did not abuse its discretion in denying the request to discharge made by the defendant, and the related motion to withdraw made by Bausch, on October 26, 2015.

II

The defendant next contends that his conviction must be reversed because he did not knowingly, intelligently, and voluntarily waive his right to a jury trial under the sixth amendment[8] to the United States constitution.[9] The defendant did not preserve this claim at trial and now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[10] We review the defendant's claim because the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Reynolds*, 126 Conn. App. 291, 298, 11 A.3d 198 (2011).

"The right to a jury trial in a criminal case is among those constitutional rights which are related to the procedure for the determination of guilt or innocence. The standard for an effective waiver of such a right is that it must be knowing and intelligent, as well as voluntary. . . . [Our Supreme Court has] adopted the definition of a valid waiver of a constitutional right as the intentional relinquishment or abandonment of a known right. . . . This strict standard precludes a court from presuming a waiver of the right to a trial by jury from a silent record. . . . In determining whether this strict standard has been met, a court must inquire into the totality of the circumstances of each case. . . . Our task . . . is to determine whether the totality of the record furnishes sufficient assurance of a constitutionally valid waiver of the right to a jury trial. . . . Our inquiry is dependent upon the particular facts and circumstances surrounding [each] case, including the background, experi-

ence, and conduct of the accused." (Citation omitted; internal quotation marks omitted.) *State* v. *Woods*, 297 Conn. 569, 583, 4 A.3d 236 (2010). "[W]hether a defendant has effectively waived his federal constitutional [right to a jury trial] is ultimately [a] legal question subject to de novo review, although we defer to the trial court's subsidiary factual findings unless they are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Rizzo*, 303 Conn. 71, 91–92, 31 A.3d 1094 (2011), cert. denied, 568 U.S. 836, 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012).

When the defendant appeared before the court, *Oliver, J.*, on the eve of jury selection, he sought to discharge his legal counsel. Following the denial of that request by the court, discussion turned to the defendant's election of a trial by jury or a court trial. The court advised the defendant as follows: "[Y]ou don't have to make your [decision right now]—you don't have to make an election to a court trial. You will have your trial by jury. You always can, if you choose to, elect to waive your right by jury. That's fine, but as it stands now you've elected . . . to have your trial before a jury of your peers, and that will start tomorrow, here. That's where it stands now. If you want time to talk to Attorney Bausch I'll give it to you, but [if] you can't make that decision now, [then] [t]hat is fine. You'll start picking your jury [tomorrow] morning. That's the default setting, as well it should be, to have a number of individuals from the community decide guilt or not guilty beyond a reasonable doubt. You have to make the decision whether you're going to have one judge do it. That's fine, too. So, if you want me to begin the canvass, I will. Otherwise, tomorrow for jury selection. . . . [A]s it stands now, before Judge Graham you'll start picking your jury."

At that point, Bausch requested an opportunity to talk with the defendant "one last time," which the court granted. Following a recess, Bausch informed the court that he had spoken with the defendant and at that time was prepared to "let him make his decision" before the court. The defendant then stated, "[w]e're doing a bench trial . . . ." After confirming that Bausch had discussed that decision with the defendant, the court observed that this decision "was the purpose of being in court" on the preceding Friday, October 23, 2015. The court then began its canvass of the defendant by asking him various questions about his age, occupation, education, and prior experience before the criminal courts of this state. When the court asked the defendant if he understood the charges against him, which included four counts of attempt to commit murder, the defendant expressed confusion, stating, "How is it four attempted murders?" The state's attorney then provided an overview of the discrete acts that formed the basis for those charges, after which the court permitted the defendant to discuss the matter with his attorney. When

Bausch then informed the court that "I explained what I had to explain, Your Honor," the court proceeded to detail the distinct allegations of the substitute information.

After completing its overview of those charges, the court asked the defendant whether he was electing a trial by jury or a court trial. The defendant stated in relevant part: "I would like some time to decide this. . . . Everybody wants to do everything in five minutes. You wait a year and a half, and nobody wants to do anything, even with discovery or anything else, and now in five minutes . . . you want to do all this." The court then advised the defendant that it had no preference as to how the defendant elected to proceed, as it would not be presiding over the defendant's trial. Rather, the court continued, "I'm here to . . . make sure you have a fair and accurate understanding of what's going to happen to you and [ensure that you] make that informed and knowing and voluntary decision whether to have a jury or court trial." After the court reminded him of his right to proceed with a jury trial or to elect to waive that right and proceed with a court trial, the defendant stated, "I don't know," and then indicated that he "would like to talk to my attorney and have a little bit of time." The defendant then asked the court, "[c]an we at least do the end of the week?" In response, the court stated: "That's not happening. . . . Your default setting . . . is to have a trial by jury. That's where you are right now. That jury trial starts tomorrow morning. If between now and then, or frankly, at any point during jury selection, you change your mind and elect to have a trial by court, you can do so, but then that waiver is gone. You cannot go back and forth. So, it is an important decision you're making, to have a trial by a jury or a court. You start with a jury, and once you elect a court trial—that's why I'm asking you all these questions about your education, your age, whether you ran your own business, because once you elect to have a court trial, you have waived your right to go back to a jury trial. . . . So, there's nothing wrong with taking the time to do that, but . . . it is final . . . . [M]ake no mistake, I'm going to ask you all the questions necessary to make the determination of whether your decision and waiver of a jury trial is knowing, intelligent and voluntary. That will happen, and you'll either have a jury trial, which is completely fine, or you'll have a court trial before Judge Graham." The court then stated: "I assume you don't want to make that decision today. Is that correct, sir?" The defendant answered, "[c]orrect," and the proceeding adjourned.

The defendant again appeared before the court, *Oliver, J.*, the next morning. At that time, the defendant indicated that he was electing a court trial. Noting that some of the questions that followed might be "duplicative of yesterday," the court began its canvass of the defendant. The court asked the defendant several ques-

tions about his age, education, occupation and prior experience with the criminal justice system. The court then confirmed that the defendant had "discussed [his] right to a jury trial" with Bausch and understood that a jury "is composed of a number of members from the community"; to each query, the defendant answered, "[y]es." The defendant also confirmed that he understood that although a jury's verdict must be unanimous, the verdict in a court trial is rendered by one person.

The following colloquy then transpired:

"The Court: Now, you're making this decision after discussing the benefits or detriments of a jury trial . . . after discussing those things with Attorney Bausch?

"The Defendant: Correct.

"The Court: And you're making this decision knowingly, voluntarily, and of your own free will?

"The Defendant: Yes.

"The Court: Is anyone forcing, threatening, or promising you anything to make you elect to waive your right to a jury trial—

"The Defendant: No.

"The Court: —and to elect a court trial?

"The Defendant: No.

"The Court: Okay. And do you have any questions for me about this decision?

"The Defendant: I would just like to apologize to Your Honor and to the jury for being here. I'm sorry about the confusion yesterday.

"The Court: Mr. Corver, as I said yesterday, this is America. The constitution guarantees you that right. You have some serious charges. It's not an easy decision to make, and there's nothing wrong with taking the time necessary to make the decision voluntarily and be informed and speak with your attorney about it, all right?

"The Defendant: Thank you.

"The Court: So, do you have any questions for me about this decision?

"The Defendant: No.

"The Court: Do you have any questions for Attorney Bausch about this decision?

"The Defendant: No."

The court confirmed that the defendant understood that "[o]nce I accept your waiver of your right to [a] jury trial, you cannot change your mind," to which the defendant replied, "[y]es." The court then entered a finding that the defendant "has been fully and adequately apprised of the consequences of his election to

waive his right to [a] jury trial and elect a court trial" and "has done so, and the court accepts the waiver."

On appeal, the defendant concedes that he made an affirmative indication of his waiver of his right to a jury trial during that canvass. See *State* v. *Gore*, 288 Conn. 770, 783, 955 A.2d 1 (2008) ("because the right to a jury trial is uniquely personal to the defendant, an affirmative indication of the defendant's personal waiver of this right must appear on the record"). He nonetheless claims that his waiver was not made in a knowing, intelligent, and voluntary manner due to (1) the alleged breakdown in communication with his legal counsel and (2) the court's refusal to grant a continuance in response to his request for more time to consider his decision. We disagree.

As detailed in part I of this opinion, the record substantiates the court's determination that a complete breakdown in communication between the defendant and Bausch did not occur. To the contrary, the evidence demonstrates that Bausch and the defendant continued to communicate in an effective manner throughout the October 27, 2015 proceeding. Indeed, when the defendant on October 26, 2015, asked the court for a continuance until "the end of the week," he expressly indicated that he "would like to talk to my attorney and have a little bit of time" before making his election of a court trial.

Furthermore, there is little merit to the defendant's contention that the waiver of his right to a jury trial was not the product of free and meaningful choice due to the court's denial of that request for a continuance. As the aforementioned colloquies between the court and the defendant reflect, the court went to great lengths to communicate to the defendant the fact that, even if he began selecting a jury, the defendant still could elect to waive a jury trial at a later date and proceed with a court trial. The defendant was represented by counsel when he twice was canvassed on that decision by the court at the October 26 and October 27, 2015 proceedings. When the defendant equivocated on his waiver during the October 26 proceeding, the court terminated its canvass and informed the defendant that it would not accept a waiver of the defendant's right to a jury trial unless it was knowing, intelligent, and voluntary. During the second canvass conducted the following day, the defendant confirmed that he previously had discussed his decision with Bausch and had no remaining questions for Bausch at that time. As our Supreme Court has noted, "[t]he fact that the defendant was represented by counsel and that he conferred with counsel concerning waiver of his right to a jury trial supports a conclusion that his waiver was constitutionally sound." *State* v. *Woods*, supra, 297 Conn. 586.

In addition, the defendant's statements during the October 27, 2015 canvass indicate that he understood

the court's various questions, including whether his election was the product of undue influence or coercion, and do not reveal any hesitation or involuntariness on the defendant's part. See *State* v. *Scott*, 158 Conn. App. 809, 818, 121 A.3d 742 (emphasizing that "[t]he record contains no indication of any hesitancy or indecision on the part of the defendant" in waiving right to jury trial), cert. denied, 319 Conn. 946, 125 A.3d 527 (2015). Notably, at the conclusion of that canvass, the defendant stated that he "would just like to apologize to Your Honor and to the jury for being here. I'm sorry about the confusion yesterday." The defendant also testified during the October 27, 2015 canvass as to his familiarity with the criminal justice system, having pleaded guilty to assault in the first degree years earlier.[11] See *State* v. *Moye*, 119 Conn. App. 143, 164, 986 A.2d 1134 ("[t]he constitutional stricture that a plea of guilty must be made knowingly and voluntarily . . . requires . . . that there be a voluntary waiver during a plea canvass of the right to a jury trial" [internal quotation marks omitted]), cert. denied, 297 Conn. 907, 995 A.2d 638 (2010); *State* v. *Smith*, 100 Conn. App. 313, 324, 917 A.2d 1017 (noting, in considering propriety of waiver of right to jury trial, defendant's "familiarity with the court system" due to criminal history), cert. denied, 282 Conn. 920, 925 A.2d 1102 (2007).

We therefore conclude that the totality of the circumstances demonstrates that the defendant's waiver of his right to a jury trial was knowing, intelligent, and voluntary. Accordingly, he cannot prevail under *Golding*'s third prong. See footnote 10 of this opinion.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In rendering its oral decision, the court made specific findings of fact as to the elements of each charged offense. Our recitation of the relevant facts includes those express findings, as well as subordinate findings that the court, as trier of fact, reasonably could have found on the evidence before it. In this regard, we note that the defendant and the victim, K, testified at trial and provided conflicting accounts of the events in question. In rendering its decision, the court, as sole arbiter of credibility; see *State* v. *Santiago*, 245 Conn. 301, 343, 715 A.2d 1 (1998); found K's testimony "highly credible" and substantiated by the exhibits and testimony of other witnesses. The court also indicated that it did not find the defendant's testimony to be credible, noting that "[h]is testimony . . . [was] consistently contradicted by the exhibits, by the testimony of witnesses in addition to [K], and, on occasion, by common sense."

[2] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. General Statutes § 54-86e.

[3] The defendant made similar remarks in a subsequent phone call to Erin Diette, a friend of K.

[4] In that phone call, Theirer stated in relevant part that "[t]hey were both were screaming. She was screaming, help me. He [was] screaming, I just stabbed her . . . ."

[5] The defendant also was charged, in a part B information, with being a persistent dangerous felony offender in violation of General Statutes § 53a-40 (a) (1) (A) on the ground that he previously had been convicted of assault in the first degree, a felony, and served a sentence of more than one year. On November 25, 2015, the defendant entered a conditional plea of nolo contendere to that charge.

[6] Jury selection was scheduled to commence on Tuesday, October 27, 2015.

[7] At trial, the defendant in *Gonzalez* made no indication that he wanted to represent himself or to have new counsel appointed. Rather, like the defendant in the present case, he simply expressed his desire to have his counsel discharged. *State* v. *Gonzalez*, supra, 205 Conn. 679–81, 682 n.6.

[8] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." That right to a trial by an impartial jury is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See *Turner* v. *Murray*, 476 U.S. 28, 36 n.9, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986).

[9] In his appellate brief, the defendant also alleges a violation of his right to a jury trial under article first, § 19, of the Connecticut constitution. In so doing, he acknowledges that our Supreme Court, in *State* v. *Marino*, 190 Conn. 639, 645–46, 462 A.2d 1021 (1983), overruled in part on other grounds by *State* v. *Chapman*, 229 Conn. 529, 541, 643 A.2d 1213 (1994), rejected the claim that, because article first, § 19 provides rights above and beyond those afforded under the federal constitution, a waiver thereof must reflect that the accused knowingly and voluntarily waived those additional rights. Furthermore, two decades later in *State* v. *Ouellette*, 271 Conn. 740, 757, 859 A.2d 907 (2004), our Supreme Court expressly was asked "to reconsider [its] state constitutional holding in *Marino*" and declined to do so.

The defendant in the present case nonetheless argues that *Marino* and *Ouellette* "should be overturned and the court should hold that because the trial court failed to advise the defendant of his state constitutional right to be tried by six jurors . . . he did not intelligently, knowingly and voluntarily waive that right." (Citation omitted.) It is well established that this court cannot overrule or reconsider the decisions of our Supreme Court. See *State* v. *Brown*, 73 Conn. App. 751, 756, 809 A.2d 546 (2002) ("Our Supreme Court is the ultimate arbiter of the law in this state. We, as an intermediate appellate court, cannot reconsider the decisions of our highest court."); *State* v. *Fuller*, 56 Conn. App. 592, 609, 744 A.2d 931 ("[i]t is not within our function as an intermediate appellate court to overrule Supreme Court authority"), cert. denied, 252 Conn. 949, 748 A.2d 298, cert. denied, 531 U.S. 911, 121 S. Ct. 262, 148 L. Ed. 2d 190 (2000). Bound by *Marino* and *Ouellette*, we decline to further consider the defendant's unpreserved state constitutional claim.

[10] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[11] We reiterate that the defendant in the present case also was charged, in a part B information, with being a persistent dangerous felony offender due to his prior conviction for assault in the first degree. See footnote 5 of this opinion.